[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Ayotte Bros., has filed a two count complaint against defendant, Joan B. Finney, the owner of real property, with improvements, located at 272-276 Albany Turnpike, Canton.
The basic allegations contained in the complaint are as follows. On or about June 19, 1989, Leigh R. Miller was defendant's lessee of the premises located at 272-276 Albany Turnpike. On or about that date, plaintiff entered into an agreement with Landev Remodeling, Inc., allegedly an agent of Miller. The agreement was for plaintiff to construct a blacktop parking area on a portion of said premises for a price of twenty one thousand two hundred and six dollars and eighty cents ($21,206.80). Subsequent to the signing, the agreement was orally modified by plaintiff and Landev to provide that plaintiff perform certain additional work in exchange for additional compensation.
From June 20 through July 11, 1989, plaintiff constructed a parking area with the modified additions. Count one of the CT Page 9775 complaint, which sounds in agency, alleges that the defendant owes the plaintiff the sum of twenty-six thousand four hundred eighty-nine and 40/100 dollars ($26,489.40) for the construction and blacktopping of the parking area.
In count two, plaintiff alleges that the defendant has been unjustly enriched by reason of her nonpayment of money owed plaintiff for the construction and blacktopping work completed at 272-276 Albany Turnpike.
The credible evidence adduced at the trial to the court established the following germane facts. On March 5, 1981, Finney, the owner of the Canton property, applied to the Canton Zoning Commission for a special exception to allow an "expansion of the present operation" on the said realty; the existing use of land and building was described on the application as "Canton Motor Car Works." A site development plan, prepared by Bernard J. Bisson, P.E., and paid for by the landowner, showed an existing building, principally occupied by Canton Motor, and partially occupied by Stone and Sterling, located on the northerly portion of the land fronting on Albany Turnpike. The site plan also depicted a proposed building to be constructed on the rear portion of the property, with access from Route 44 (Albany Turnpike) and a curbed, paved area adjacent to the said building. The special exception and site development plan were approved by the Commission on May 5, 1981.
Miller was a principle in a corporation known as Europart, Inc. On October 26, 1982, Finney, as lessor, entered into a written lease agreement with Europart, Inc., as lessee, whereby Europart would occupy the premises at 272-276 Albany Turnpike; said lease was for a stated term of ten years, commencing November 1, 1982, at an annual rental of $21,000, payable monthly at $1,750. The lease instrument recited that a portion of the existing building was occupied by Stone and Sterling at $350 per month; the lessor's right to the Stone and Sterling rent was assigned to the lessee, Europart (or Miller), under the terms of the 10/26/82 lease agreement. The Europart lease further provided:
 "During the term of this lease, the Lessor may construct a building in the reserved portion of the premises in accordance with the site plan approval. The Lessor will assure that the exterior appearance of CT Page 9776 such building shall be in keeping with the leased premises."
Thus, the 1982 lease contemplated the construction of another commercial building on the subject land, towards the rear portion thereof, south of Route 44; however, the site plan approval expired before any building was constructed on the rear land.
On or about August 8, 1988, Finney filed a second application with the Canton Zoning Commission, describing the existing use as "Auto Service," and requesting a special exception and site plan review for a proposed altered use and construction described therein as follows: "site plan modification for construction of 3200 [sq. ft.] building — previously approved 5-13-81 with signage." A second site plan, dated August 1, 1988, showing the proposed new building on the back land, and the proposed paved area, was prepared by Shannon Engineering Associates, paid for by Finney, and submitted to the Commission. On October 24, 1988, the Zoning Commission, following a public hearing, "voted to approve the application of Joan B. Finney, 274 Albany Turnpike (German Auto, Inc.) for Special Exception and Site Plan Modification" subject to conditions, including that "the site shall be landscaped to buffer views of the eastern aspect of the building and/or site with requirements for planting and landscaping as established by staff."
On October 26, 1988, prior to the expiration of the 1982 lease, a new lease was negotiated by Joan B. Finney and Leigh H. Miller; this lease was for a term of ten years, "commencing the 1st day of the month after issuance of a Certificate of Occupancy," at an annual rental of $24,000, payable monthly at $2000. The 10/26/88 lease provided:
 ". . . Lessee agrees to pay all taxes, insurance premiums, sewer use, water charges, mortgage payments on the construction mortgage, and such other municipal assessments as may be levied upon the premises . . . and all such payments to be considered made by the Lessee for purposes of income tax deductibility. In addition, the Lessee shall be entitled to depreciation deduction for income tax purposes upon the new building to be erected upon the premises." CT Page 9777
The second lease further provided, as follows:
 "It is contemplated that the Lessee shall build a building containing 3200 square feet at the rear of the premises in accordance with the site plan approved by the [Commission] in 1981. The site plan approval has expired and the Lessor agrees to take such action as is necessary to promptly seek renewal and re-approval of such plan. If approved, the Lessor will obtain a mortgage in the amount of [$150,000] for the construction of the building, and [Miller] . . . agrees to co-sign the mortgage note and further agrees to pay said note according to its terms and hold [Lessor] harmless."
 "After initial construction of the building, the Lessee may at its own expense make such . . . alterations and renovations to the interior of the building as he shall desire, subject to approval of plans of such renovations or alterations by the lessor, and subject also to such requirements as may be imposed by the building inspector."
The lease afforded the lessee the right of first refusal in the event of a sale of the property by the lessor subject tocredits set forth in the portion of the instrument relating to the lessee's option to purchase. Under the option to purchase clause, the purchase price was to be the average of the values accorded the property by three separate appraisers. The instrument stated that from the value, or purchase price, so determined, there "shall be deducted the actual cost of the new building, including engineering costs and all site work in the project and including the interest paid upon the mortgage during the period of construction." In this regard, the lease went on to state:
 "All such costs shall be determined by the contract price, in the event of a written contract, or the invoice price for materials and services used in the construction. Evidence of these prices shall be delivered to the Lessor at the time that the costs are incurred so that, at all times, there will be a current running balance of-the cost of the building."
The terms of the 1988 lease were to become effective upon the CT Page 9778 issuance of a Certificate of Occupancy for the "new building to be constructed upon the premises," and, the existing lease (10/26/82) would become void at that time.
The new building, as contemplated in the 1988 lease, was completed sometime in the Spring of 1989. The arrangement was that Finney would put up the shell of the rear building, and Miller then would complete the interior, as well as the land around the building, to suit his business needs. Pursuant to this plan, Finney obtained a construction mortgage from Collinsville Savings in the amount of $150,000; it was apparently agreed that of said sum, $125,000 would be expended to construct the shell, and $25,000 would be utilized for expenses (attorney's fees, engineering costs, etc.), with the understanding that whatever remained of the $25,000 would be given to Miller for use in finishing the building's interior and curtilage as needed for the operation of his business. Consistent with this plan, Finney contracted with RJB for the construction of the building's shell. Upon completion of the shell in Spring, 1989, Miller went into possession and commenced paying rent to Finney under 1988 lease. Included among the improvements Miller made with respect to the rear building and land was the paving.
Between June 29 and July 11, 1989, plaintiff did the paving and related work in and around the newly constructed building. Ronald Ayotte, the president of Ayotte Brothers Construction Co., Inc., was contacted sometime in May 1989 by a representative of Landev Remodeling, Inc., of Simsbury; Landev was the contractor doing the work for Miller/German Auto, Inc. on the new building (completion of the inside of shell, exterior improvements, etc.). On June 19, 1989, Ayotte entered into a contract with Landev (signed by Brady on behalf of Landev) to do the paving and bituminous work in the parking area adjacent to the rear building; the contract amount was $21,206.18. In addition to the work covered by the contract, Ayotte at a subsequent point in time, returned to the site to do shoring, drainage, and other site work; this additional work performed by Ayotte was approved by Miller. The total bill submitted to Landev Remodeling by Ayotte Bros. was in the sum of $28,608.55; Ayotte has not been paid for the work performed on the property.
At some point, Ayotte Bros. placed a mechanics lien on the property at 272-76 Albany Turnpike. Ayotte never met CT Page 9779 Finney, never entered into any contract with Finney, and first became aware of the property owner's identity in connection with the mechanic's lien. Ayotte had dealt primarily with Landev, and also with Miller; Mr. Ayotte testified that he never brought an action against Miller because he did not know where Miller had gone following completion of the site work. He does not know if Miller ever paid Landev.
Robert Coffin bought the assets of German Auto, and all rights under the lease, including the option to purchase. The terms of the option were as stated heretofore; purchase price to be the average of three current appraisals less credit for mortgage payments, monies invested in the building (completion of interior of shell, interior and exterior renovations, etc.), and associated work. Coffin paid approximately $230,000 for the assets of the existing business and the leasehold rights. At the time of the purchase, plaintiff had the mechanic's lien on the property, which lien was in the approximate amount of $27,000; therefore, at the closing $35,000 was set aside in escrow to satisfy the Ayotte lien. In a court proceeding, pending at that time, Ayotte's mechanic's lien was discharged by the court, possibly as a result of defective notice; accordingly, the escrow fund was released to Miller or his nominee(s). As of the trial of this case, Coffin had not exercised his rights to purchase the real property under the option provisions of the 1988 lease.
While work was being done pursuant to the Ayotte/Landev contract, Ronald Ayotte, President of Ayotte Bros. visited the site and inspected the job; Ronald Ayotte's son, S. Ayotte, served as the job foreman, directly supervised the job, and was at the Albany Turnpike site the entire time. The job consisted primarily of paving and bituminous concrete work; the additional work apparently involved certain drainage construction work towards the rear of the property. Both Ronald Ayotte and his son, S. Ayotte, have had many years experience in the paving and concrete business. The specific work performed is detailed in Ayotte Bros.' contract with Landev (Exhibit #8) and Ayotte's bill (detailed statement) forwarded Landev (Exhibit #9). The parties do not dispute, and the court finds, that the value of services and materials provided by Ayotte for paving and other work under the Landev contract is equivalent to that set forth in Ayotte's bill (Exhibit #9), that is, $26,489.40. CT Page 9780
No evidence was presented as to whether Miller ever paid any amounts to Landev. Coffen, never having exercised the option rights assigned to him, pays rent to Finney as per the 1988 lease. Finney never dealt with, or contracted with, Ayotte Bros.; Finney testified, credibly, that she never stated, or agreed, she would be responsible for the costs of work Miller did, or had done, on the property for purposes of rendering the location suitable for a commercial use.
I. Agency
The first count of the complaint alleges that defendant Finney is liable to plaintiff Ayotte Bros. under a theory of agency. Plaintiff argues that although defendant did not directly hire it to do the paving and other site plan improvements, defendant was, in fact, heavily involved in the project; furthermore, plaintiff argues that alterations or renovations to the property were subject to defendant Finney's approval, and, because the defendant obtained the construction mortgage to pay for the erecting of the rear building, any work authorized by the lessee was so authorized pursuant to the lease agreement and site plan approvals. Therefore, plaintiff contends that the lessee Miller was acting as the agent of the defendant/lessor (Finney).
Defendant maintains that there is no evidence of an agency relationship between the lessee Miller and herself. Further, defendant argues that the status of landlord/tenant does not equate to an agency relationship.
In McLaughlin v. Chicken Delight, Inc., 164 Conn. 317,321, 322 A.2d 456 (1973), the court stated:
 (1) Agency is the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. (2) The one for whom the action is to be taken is the principal. (3) The one who is to act is the agent.
Three elements are required to show the existence of an agency relationship: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that CT Page 9781 the principal will be in control of the undertaking. Hall v.Peacock Fixture Electric Co., 193 Conn. 290, 294,475 A.2d 1100 (1984). If a principal/agent relationship in fact exists, the principal is "only bound by, and liable for, the acts which his agent does with or within the actual or apparent authority from the principal and within the scope of the agent's employment." Newtown Associates v. NortheastStructures, Inc., 15 Conn. App. 633, 637-338 [637-638] (1988);see also: Bank of Montreal v. Gallo, 3 Conn. App. 268, 273 (1985). Notice to, or the knowledge of, an agent while acting within the scope of his authority, and in reference to a matter over which his authority extends, is notice to, or knowledge of, the principal. Bank of Montreal v. Gallo, supra. "The knowledge of the agent is considered knowledge of the principal . . ." Id. at p. 275.
Here, defendant Finney did not directly hire either Landev or Ayotte Bros. to perform the subject construction work (paving and bituminous concrete work) on, and around, the rear building. The lease neither provided, nor by its language reasonably contemplated, that defendant would be liable for improvements made by Miller in connection with the rear building; the evidence, and the reasonable inferences to be drawn therefrom, fairly established that defendant was to obtain the construction mortgage (with Miller as a co-signer on the secured note) and engage in the construction of the new building's shell, while Miller was to complete the building and improve the rear area. On the evidence presented (including the documentation), there was no manifestation by the defendant/lessor that the lessee (Miller) would act on her behalf in respect to paving improvements on the rear land. The lessor/lessee relationship did not, in and of itself, or under the terms and language of the 1988 lease, give rise to an agency relationship between Finney and Miller. Miller was to make the improvements with respect to the rear building, and he dealt with Landev, and directly or indirectly, with Ayotte Bros. The evidence does not support a finding that Finney intended, or consented, to have Miller act in her behalf, as her agent, with the authority to bind her financially with regard to contracts for improvements made by Miller to the back property. There not having been established any manifestation of consent by the defendant Finney that Miller should act in her behalf, and subject to her control, which manifestation is, as stated, an element of the agency relationship, defendant cannot be held liable under CT Page 9782 an agency theory on the Miller/Landev/Ayotte Bros. contractual arrangements for the paving and related improvements at the rear portion of the premises.
Plaintiff cites Newtown Associates v. NortheastStructures, Inc., supra. The Newtown case was before the court in the context of an application to discharge a mechanic's lien placed by a contractor on the plaintiff/lessor's property; the leased property was to be converted from its former use as a dairy farm to the lessee's intended use as an Arabian Horse farm and, to accomplish such conversion, each party to the agreement was to make certain specified improvements to the land. Hicks was plaintiff's agent and he entered into contracts with respect to the improvements that plaintiff/lessor was obligated to make to the property; in such regard, there was no dispute regarding an agency relationship between plaintiff and Hicks, or that because of such relationship, Hicks could contractually bind plaintiff for the specific improvements it was to effect under the agreement with the lessee. The circumstances of the dispute in Newtown were stated by the Appellate Court, as follows:
 "In this case it is clear that the defendant [contractor] entered into an agreement with the plaintiff [lessor] through its agent, Hicks, to provide certain of the improvements the plaintiff [lessor] was required to make under its lease with the Hayeses. Further, the record indicates that Hicks specifically authorized certain changes in the project which were not called for in the lease and committed the plaintiff to pay for those changes. The record reflects, that when these charges were billed to the plaintiff, they were paid. It is defendant's contention, however, that Hicks, acting as the plaintiff's agent, took further steps which committed the plaintiff [lessor] to pay for all of the work done on the property.
Thus, in Newtown, unlike the present case, it was clear (undisputed) that Hicks was, in fact, the property owner's agent. The Appellate Court upheld the discharge of the mechanic's lien, which covered charges for improvements the plaintiff/lessor was not obligated to make under the agreement with the lessees [Hayeses], on the basis that the plaintiff'sCT Page 9783agent had neither actual nor apparent authority to obligate the principal for the costs of those improvements. The factual setting, and legal analysis, involved in the Newton
decision, assumes the existence of an agency relationship, which is not present in this case, and under Newtown, even with a clear principal/agent relationship, the principal/lessor would be bound only on those improvements it was obligated to make under the lease, unless the agent had actual or apparent authority to contractually bind the principal/lessor for additional charges. Newtown, in my view, does not support, factually and/or legally, plaintiff's contentions in the present case.
On the basis of the aforesaid, the court concludes that Miller, as defendant's lessee, was not acting as defendant's agent in his dealing with either Landev or Ayotte Bros.; therefore, judgment may enter for the defendant on Count One of the complaint.
II. Unjust Enrichment
Plaintiff maintains that it performed services for, and provided materials on land owned by, defendant Finney, and points out that she has testified as to not having paid for the said materials and services; furthermore, defendant offered no proof that said materials and services were paid for by anyone else. In response, defendant argues that she has received no benefit as the costs of improvements are to be deducted from the option price, and, that there is no evidence that the general contractor was not paid by the lessee.
"The right of recovery for unjust enrichment is equitable, its basis being that in a given situation it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy . . . . Plaintiffs seeking recovery for unjust enrichment must prove(1) that the defendants were benefited, (2) that thedefendants unjustly did not pay the plaintiffs for thebenefits, and (3) that the failure of payment was toplaintiff's detriment." (Emphasis added). Polverari v.Peatt, 29 Conn. App. 191, 200-01 (1992); see also: MonarchAccounting Supplies, Inc. v. Prezioso, 170 Conn. 659, 665-66
(1976); Burns v. Koellmer, 11 Conn. App. 375, 382 (1987); CT Page 9784Garwood Sons Construction Co. v. Centos Associates LimitedPartnership, 8 Conn. App. 185, 187 (1986); Montanaro Bros.Builders, Inc. v. Snow, 4 Conn. App. 46, 53 (1985). "Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to a contract . . ." A C Corporation v.Pernaselci, 2 Conn. App. 264, 265, 477 A.2d 166 (1984); seealso: Garwood Sons Construction Co. v. Centos AssociatesLimited Partnership, supra at p. 187. "The right of recovery for unjust enrichment is equitable, `its basis being that in a given situation it is contrary to equity and good conscience for the defendant to retain a benefit which has come to him at the expense of the plaintiff.'" National CSS, Inc. v.Stamford, 195 Conn. 587, 597 (1985); Polverari v. Peatt, supra at p. 203; Garwood Sons Construction Co. v. CentosAssociates Limited Partnership, supra at p. 187. The burden of proving an unjust enrichment rests upon the plaintiff. Seee.g.: Garwood Sons Construction Co. v. Centos AssociatesLimited Partnership, supra at p. 188; Montanaro Bros.Builders, Inc. v. Snow, 190 Conn. 481, 490 (1983). The principle of unjust enrichment is grounded on the concept that a person should not be permitted unjustly to enrich himself at the expense of another, but rather, should be required to reimburse the other for property received or retained.Polverari v. Peatt, supra at p. 203. The Appellate Court has stated that in such circumstances, the question presented is: "Did he [the party liable], to the detriment of someone else, obtain something of value to which he was not entitled?" Id. With regard to an unjust enrichment, the trial court, in assessing damages, "balances the equities of the parties to determine where the loss should fall." Id.
Defendant Finney, as the land owner, has had her property improved by the paving work done by plaintiff. Furthermore, the evidence clearly indicates that she has not paid for the paving completed by Ayotte Bros., and that plaintiff has not been paid for the work by anyone else. Additionally, having not been paid for the work and materials plaintiff furnished at the site of the new building (rear portion of defendant's land) at 272-76 Albany Turnpike, defendant Finney has had her property improved to the detriment of plaintiff/Ayotte Bros. Since the improvement to the property resulting from plaintiff's paving work would constitute a benefit to defendant, for which she has not paid, the elements of an unjust enrichment arguably appear to have been established. However, defendant contends (1) that she actually has not CT Page 9785 received a benefit because upon the exercise of the option to purchase the leased premises, the purchase price she would receive is to be reduced by the costs of the improvements (including paving), and (2) that for the same reason (cost of improvements to be deducted from option price), she has not unjustly (or unjustifiably) declined to pay for the improvement made to her property by Ayotte Bros.
After examining the documentary evidence, considering carefully the testimony presented, and reviewing the authorities cited, the court is unable to concur with defendant's analysis and conclusion. The paving to the rear portion of defendant's land was an improvement to the property and constitutes, at this time, a benefit bestowed on the landowner, for which payment has not been made to plaintiff. Defendant/Finney asserts that if upon an exercise of the option, the purchase price was reduced by the cost of the paving, she would, if this court now finds an unjust enrichment, be paying for the paving twice: now, pursuant to a judgment of this court, and, later upon the exercise of the option when the cost of the paving improvements could be deducted from the purchase price paid by the person exercising the option. However, as plaintiff has stressed, the option has not been exercised at this time, and there is certainly no assurance that it ever will be exercised. The option may be exercised only during the last year of the present term of the 1988 lease; that is, during a one year period from October 26, 1997, unless, the lessee, or the lessee's assignee, exercises an option to extend the lease for an additional term of five years, in which event the option to purchase, on its existing terms, shall extend beyond the tenth year of the present term. As stated heretofore, in an unjust enrichment situation, the court must "balance the equities" and "determine where the loss should fall." Plaintiff has completed the paving improvements to defendant's land and has not been paid; whether the option to purchase will be exercised on or after October 26, 1997, and/or whether the option to renew the 1988 lease for an additional five year term from 10/26/98 will be exercised (thereby extending the period during which the option to purchase can be exercised), are matters which are subject to speculation. In balancing the equities, it does not appear to this court that it is equitable and just that plaintiff, who has provided services and materials in the improvement of defendant's property, should be deprived of payment therefore based on a somewhat uncertain eventuality CT Page 9786 that an option to purchase the property, and/or an option to extend the lease term, may be exercised at some future point in time.
With reference to the decrease of the option purchase price by the cost of improvements, it is additionally observed that for the purpose of determining the purchase price, the lease provided for the delivery to the lessor of evidence of the costs of improvements "at the time the costs [were] incurred so that, at all times, there [would] be a current remaining balance of the cost of the [new] building." At trial, no evidence was presented regarding documentation furnished the lessor/Finney by the lessee/Miller pertaining to any costs incurred by Miller for paving work, or substantiating that Miller had made payments to defray the expenses of paving in connection with the construction of the new building. Since, on the evidence, it is uncertain whether the lessee ever incurred any costs related to paving, and since there is no evidence of compliance with the stated provision of the option portion of the lease, it is at least questionable that upon any future exercise of the option to purchase, the costs of paving necessarily would be deductible in calculating the option purchase price.
Citing Garwood Sons Construction Co. v. Centos AssociatesLimited Partnership, supra, defendant maintains that plaintiff's unjust enrichment claim must fail because there is no evidence that Landev, the general contractor, was not paid by the lessee/Miller. In Garwood Sons, the plaintiff subcontractor sued the defendant property owner, Centos Associates, on the ground of unjust enrichment based on carpentry work done by Garwood on Centos Associates' real property. Stating that the plaintiff had the burden of proving an unjust enrichment on the part of the property owner Centos, the Court determined that the evidence of record was insufficient to establish an unjust enrichment in that there was no evidence as to whether Centos had paid the general contractor. Understandably, if the property owner paid the general contractor for the sub's carpentry work, the property owner would not be unjustly enriched by receipt of the carpentry work it paid for. In the present case, the evidence is clear that the property owner, defendant Finney, did not
pay for the paving work done at 272-76 Albany Turnpike. Miller was not the equivalent of the property owner and, accordingly, was not in a position tantamount to that of CT Page 9787 Centos Associates in the Garwood case. In Garwood, Centos was the property owner, and may have paid for the benefit it received, from the work done by the subcontractor, by paying the general; in the instant case, defendant Finney was the property owner, she received a benefit to her realty from the paving work done by plaintiff, and the evidence indicated she had paid no one for that paving work.
The court finds that as a result of paving work done by plaintiff, defendant (1) was benefited by the improvement done on her back property, (2) she unjustly did not pay plaintiff for the benefit received, and (3) the defendant's failure of payment was to the plaintiff's detriment. Accordingly, plaintiff has established the Count Two ground of unjust enrichment as a basis for recovery from the defendant/Finney of the fair value of paving improvements on defendant's property.
As stated, the value of the services and materials furnished by defendant Ayotte Bros. is not in dispute. Judgment may enter in favor of the plaintiff, against the defendant, on Count Two of the complaint in the sum of $26,489.40, plus costs.
Mulcahy, J.